STATE, Respondent, v. CARUSO, Appellant.

*No. State 76.   Argued October 29, 1969.—Decided November 25, 1969.*

(Also reported in 172 N. W. 2d 195.)

698

For the appellant there was a brief by *Oldenburg & Lent,* and oral argument by *Charles P. Dykman,* all of Madison.

For the respondent the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, *William A. Platz,* assistant attorney general, and *James C. Boll,* district attorney of Dane county.

ROBERT W. HANSEN, J. Some years ago, a Britisher by the name of Cyril Smith recorded a monologue entitled, "How Fights Start in Saloons." Every tavern-keeper and bartender learns from bitter enough experiences that minor irritations can escalate into serious situations. Often enough the police, summoned to quiet the disturbance, themselves become the target of the combativeness of the disturbers.

Here a group, of which the defendant was one, entered the tavern. Feeling their oats, they used obscene language directed to other patrons, and generally behaved in a loud and boisterous manner. Trouble was wisely anticipated, and three police officers in uniform were summoned to the scene. The arrival of the officers temporarily calmed the situation, but the peace was short-lived. The boisterous conduct was resumed and the officers became the target of the disturbers. The officers had the noisy ones step outside the tavern. Testimony which the jury believed established that thereafter the defendant swung at Officer Finn with a beer bottle, punched him in the mouth and repeatedly kicked him in the groin.

The statute under which the defendant was charged, sec. 940.205, Stats., provides that:

". . . Whoever causes bodily harm to a peace officer, as defined in s. 939.22 (22), or fireman, acting in his official capacity and the person knows or has reason to know that the victim is a peace officer or fireman, by an act done with intent to cause bodily harm to the peace officer or fireman, without consent of the person so injured, may be imprisoned not more than 2 years."

Defendant's attorney claims that this statute ". . . is designed to protect police and fire officers during riots, demonstrations, and other large scale disorders." Authority for this concept of limited applicability of the statute involved is a law review article,[1] in which the author concludes that riots in Milwaukee and disorders on the university campus in Madison ". . . were the catalysts for action by the legislature in adopting 940.205. . ." and the statute ought not be used ". . . in the absence of the aggravated circumstances which occasioned its passage . . . ."

It is the well-established rule for statutory construction that reference to matters outside the language of the

[1] 1969 Wisconsin Law Review, 340, 342, 344.

statute is to be had only when there is an ambiguity as to the meaning of the language used in the statute.[2] An ambiguity exists only where the language used in the statute is susceptible to two or more reasonable interpretations.[3] In the absence of ambiguity, the meaning of a statute is to be read from the language used. Here the language is clear, plain and unambiguous. The statute is to be read to mean what it says, no more and no less.

Undoubtedly, legislators, like the average citizen, were well aware of the riot in Milwaukee and campus disorders in Madison in the summer and fall of 1967. News media coverage of these mass and massive disturbances insured that they were. However, publicized riots and campus confrontations are not an entire story. They are the one eighth of an iceberg that is above the surface. It does not follow that either citizens or legislators were unaware of the seven eighths of the iceberg lurking beneath the surface. The law review article relied upon by defendant's counsel cites statistics as to assaults upon police officers from the annual uniform crime report of the Federal Bureau of Investigation.[4] Legislative action making as-

[2] ". . . While the legislative intent may have been otherwise . . . yet it is not within the province of this court to seek secondary sources of legislative intent where the meaning of the statute is plain and unambiguous." *West Side Bank v. Marine Nat. Exchange Bank* (1968), 37 Wis. 2d 661, 669, 670, 155 N. W. 2d 587; *see also Miller v. Wadkins* (1966), 31 Wis. 2d 281, 142 N. W. 2d 855.

[3] *Weather-Tite Co. v. Lepper* (1964), 25 Wis. 2d 70, 130 N. W. 2d 198; *see also State ex rel. Neelen v. Lucas* (1964), 24 Wis. 2d 262, 267, 128 N. W. 2d 425.

[4] ". . . Major civil disorders broke out in eight cities during the summer of 1967. Violence to policemen was increasing dramatically. In 1964 there were 18,001 assaults on policemen reported in the United States. The results of these assaults were 7,738 policemen injured and 57 killed. In 1965 there were 20,523 assaults, 6,836 injuries, and 53 deaths; in 1966, 23,851 assaults, 9,113 injuries and 57 deaths; in 1967, 26,755 assaults occurred, with 10,770 injuries and 76 deaths. These figures show a steadily increasing

saults upon police officers a felony and increasing the penalties for such assaults must be related to the total picture, not solely to a few well publicized incidents.

There is no reason to assume that the legislature intended to give added protection to police officers and firemen only during the situations of mass disorder that attract media attention and coverage. There is no claim made that even a majority of the assaults and injuries sustained by peace officers as reflected in the FBI statistics arose out of situations of mass disorder. It is not unknown that police officers have been assaulted while responding to a call of family trouble. The law officer making a routine traffic arrest may face bystanders who take up the cudgels for the person placed under arrest. Every call to respond to a tavern fracas or street corner brawl involves some possibility of danger to an officer or officers summoned to the scene. It is this risk of danger to police and fire officers with which the legislature must be presumed to have intended to deal, not with the locale of a particular assault. It is the unprovoked striking of the officer, not the place of the striking, that the legislature has made a felony. Policemen or firemen do not hire out as punching bags or sparring partners for anyone when they don the uniform.

Defendant's attorney claims that unless this statute is interpreted to be limited to city riots and campus disturbances, it deprives the defendant of a constitutionally assured equal protection of the law. This claim could be true only in reverse. If the statute did in fact apply only to faculty and students on campus and inner city

number of assaults over the last four years, and an alarming increase in deaths (40 percent) and injuries (60 percent) during the last two years. Against this background 17 states and the District of Columbia have passed or amended legislation to provide increased penalties for violence to police or firemen." *1969 Wis. L. Rev., supra*, 342, 343, citing *FBI Uniform Crime Reports*, published annually by the United States Department of Justice.

residents in big cities, the claim of unequal treatment might then arise. There are some who have argued for a near-sanctuary type concept that would place the campus, at least, either beyond the reach of civil authorities or subject to a different measuring stick as to criminal or disorderly behavior. Nothing in the constitutions, state or federal, makes university premises such a protected enclave, and neither do the constitutions suggest that assaulting a policeman should be considered a serious crime only if the assault takes place on campus or as part of a public disturbance. The plain fact is that nowhere in the state or federal constitution is there to be found any right to assault a law officer anywhere while he is engaged in the performance of his official duties. How seriously such unjustified assault upon such officer is to be treated is for the legislature to determine.

Defense counsel would like to see grafted onto sec. 940.205, Stats., the requirement that the person doing the assaulting know or have reason to know that the officer at the time is acting in his official capacity. That argument is to be addressed to the legislature, not to the courts. The legislature has required that it must be proved that the person causing bodily harm to a peace officer know or have reason to know that the victim is a peace officer. To go beyond this to require that a defendant also know that the officer was then and there acting officially would introduce an element of required proof sometimes very difficult to ascertain or establish. On the record here, it seems clear that the defendant knew or should have known that the officer he struck was acting in an official capacity. The officer, whom the defendant knew, along with his fellow officers, arrived at the tavern in full police uniform in response to a call from a superior officer. Any claim that the defendant believed that Officer Finn came as an off-duty citizen, to join in the "socializing," has slim support in this

record. Knowledge on the part of the defendant that the officer was present and acting in an official capacity is not a required element of the crime charged.

In summary, the Wisconsin legislature, as it had a right to do, has upgraded the seriousness and increased the penalty for causing bodily harm to a peace officer or fireman in this state. Such offense of battery upon a peace officer or fireman now has five elements:

(1) Causing bodily harm to a peace officer or fireman;

(2) The peace officer or fireman is acting in his official capacity;

(3) Where the person knows or has reason to know that the victim is a peace officer or fireman;

(4) Where the act is done with intent to cause bodily harm;

(5) Without the consent of the person so injured.

In so doing, the legislature has not declared a closed season for attacks upon peace officers only in certain locales or under certain circumstances. It has closed the season for attacks upon peace officers, period, at any time or any place within the state. It had both right and reason so to do.

At the time of trial the defendant raised three primary issues:

(1) That Officer Finn was not in fact acting in his official capacity at the time of the battery;

(2) That Officer Finn consented to the battery committed upon him;

(3) That the defendant acted in self-defense.

The testimony in this case was given by the officer who was injured, the defendant who was charged with inflicting injury, the other police officers present, and the owner of the tavern where the incident took place. There was conflict in the testimony given, but it was for the jury, not this court on review, to determine the issues of weight and credibility involved. It is the precise

function of the jury to decide the facts, and, if there is sufficient evidence to support their findings, their verdict stands.[5] There is sufficient evidence here.

As to the claim that the officer was not in fact acting in an official capacity and the claim that the officer consented to the battery, there is little in the testimony upon which such claims could be upheld. As to the claim of self-defense, the defendant did testify at the trial that he acted in self-defense. The injured officer and others testified that he did not. On this issue, it was a question of what testimony and which witnesses were to be believed. That was for the jury to determine,[6] and it is clear that the jury members did not believe the account given by the defendant, and did believe the account given by other witnesses.

The evidence adduced at the trial, rationally considered and obviously believed by the jury, supports the verdict of guilty.

*By the Court.*—Judgment affirmed.

[5] "On appeal in a criminal case the test of the sufficiency of the evidence for a conviction is whether the evidence adduced, believed and rationally considered by the jury was sufficient to prove defendant's guilt beyond a reasonable doubt. . . ." *Jensen v. State* (1967), 36 Wis. 2d 598, 607, 153 N. W. 2d 566, 154 N. W. 2d 769.

[6] "On review, it is not the function of the appellate court to decide which witnesses are to be believed. That is the exact function of the trier of fact, be such trier of fact the judge or a jury. . ." *State v. Christopher*, ante, p. 120, 127, 170 N. W. 2d 803, 806.